Russell v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-346-CR

EVERETT EUGENE RUSSELL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Everett Eugene Russell appeals his conviction for violation of a protective order.  A jury found Russell guilty and assessed his punishment at 365 days’ confinement and a $2,000 fine.  In five points, Russell contends 
that the evidence is legally and factually insufficient to establish that he violated a protective order and that the trial court erred by failing to grant a mistrial after an inadmissible portion of a 911 tape was played for the jury.  We will affirm.

II.  Factual Background

During the course of Erin McRae’s divorce from Russell, the 303rd District Court of Dallas County issued a protective order against Russell.  A certified copy of the protective order was admitted into evidence.  It prohibited Russell “from going to or near the residences or places of employment or business of [McRae]” and specifically prohibited Russell “from going to or near the residence at 2120 Pueblo Drive, Carrollton, Dallas County, Texas.”  When the protective order was issued, McRae lived at 2120 Pueblo Drive in Carrollton,  but at the time of the incident, she had moved into her stepfather’s house at 105 East Brown Terrace.  This house was located at the end of a dead-end road in Shady Shores, Texas. 

On February 26, 2005 at about 10 o’clock a.m., McRae and a friend who had spent the night at the house with her, Heather Trout, were feeding horses on the property when McRae saw a white truck parked on the road.   McRae then saw Russell walking down the fence line on her stepfather’s property.  McRae and Heather ran back to the house.  They obtained binoculars and verified that the man they saw on the property was Russell; then they got down on the floor in the house, and McRae called 911.
(footnote: 2)  Heather called McRae’s mother.  

McRae testified that she was certain the man she saw on her stepfather’s property was her ex-husband, Russell, because she recognized his walk and the clothes he was wearing.  She explained that Russell had “kind of a limp” because he had undergone back surgery, that he would cock his head when he turned to look at something, and that she had washed the items of clothing he was wearing—black nylon pants, a maroon and darker blue jacket, and a white T-shirt—several times when they were married.  McRae testified that she had no doubt that the person she saw through the binoculars was Russell.

McRae testified that Russell had been to her stepfather’s property on one occasion about two and a half or three years earlier.  She did not tell Russell that she had moved to this property and took precautions to prevent him from discovering that she was living there.  She testified that Russell must have remembered visiting the property and must have surmised that she might be living there because he knew that she owned three large dogs and would be residing at a location that could accommodate her dogs.  McRae testified that her vehicle and Heather’s vehicle were parked in the driveway and would have been recognized by Russell.  She explained that Russell had no reason to be “out there.” 

Heather testified that Saturday morning, as she and McRae were feeding horses, McRae saw a parked white truck and claimed to see a man running.  McRae told Heather to get to the house; when Heather looked through the binoculars, she recognized the man McRae had seen as Russell.  She had no doubt that the man she viewed through the binoculars was Russell.  

Sergeant David Allen with the Corinth Police Department responded to a dispatch on February 26, 2005 on Brown Terrace Road for a violation of a protective order.  He stated that a fellow officer searched the area but was unable to locate Russell or anyone else that might match the description given by McRae.  Sergeant Allen and the other officer escorted Heather and McRae out of the area.  Sergeant Allen testified that he arrived at 10:47 a.m. and left at 11:07 a.m. 

Russell’s mother, Charlene, testified in his defense.  She explained that she left her house at 9:45 a.m. on the date in question to attend a funeral.  She said that when she left Russell was awake.  Charlene testified that Russell planned to get on the internet to obtain some prices for products from Lowe’s and Home Depot for remodeling her bathroom.  She testified that Russell was at home when she returned from the funeral at 4 p.m. and that his car was in the same spot as when she had left.  Charlene testified that she thought Russell was at home the previous night, but she did not get off work until 11:30 or 11:45 p.m. 

Russell’s older brother, Travis Todd Russell, also testified on Russell’s behalf.  He explained that he had called his mother’s house between 10 and 11 a.m. on February 26, 2005 and had asked Russell to check on the status of his income tax refund. 

Russell took the stand and testified that he was at his mother’s house on Saturday morning, February 26, 2005 at 10 o’clock a.m.  Russell said that his brother Travis called at 10:15 and that they talked for about twenty-four minutes.  Russell said he checked on his brother’s income tax refund on the IRS website that morning and also checked prices on Home Depot’s website and Lowe’s website.  Russell had made a disk showing the websites that he had visited on February 26, 2005, and the “cookies” on the disk showed that he was on the IRS website at 10:29 a.m. Central Standard Time.  The disk also shows that Russell was online from 10:29-11:00 a.m. and again at 1:04 p.m.  Russell testified that he did not leave his mother’s house at all that morning and that he was there when his mother returned from the funeral. 

With regard to the house in Shady Shores, Russell testified that he had been there once a few years ago.  Russell said that the house was 27.4 miles from his mother’s house and that it would have taken him forty-five minutes to drive there.  Russell denied knowing where McRae lived; he said that he knew only that the house on Pueblo Drive had been foreclosed on, so he knew she was not living at that location.  Russell also denied owning or driving a white Suburban and said that he could not run or walk fast because of his back.

James Willingham, a felony investigator for the criminal district attorney’s office working in computer forensics, testified as a rebuttal witness.  He explained that a “cookie,” like the ones that Russell had copied to the disk, gets its date and time from the computer and that the computer’s date and time are set by the user.  Thus, he concluded that the dates and times on the disk purporting to show when Russell allegedly visited the websites are “valueless, absent any other context, to say when they were actually done.”  

Brittany Dieterich, McRae’s half sister, also testified in rebuttal.  Brittany testified that at about 1:30 a.m. on February 26, 2005, she heard a loud car coming down her street in Carrollton.  She also heard someone “hooting and hollering.”  She explained that she thought the noise was strange because her street is typically very quiet.  Brittany said that she looked out the window and saw a white sport utility vehicle making a U-turn.  She recognized the driver; she said she is certain it was Russell.  She explained that Russell knew that McRae’s mother lived there.  The family called the police and also called McRae.  

Dieterich also testified that on February 27, 2005, the day after the incident in question, she and McRae went to the house in Shady Shores to feed the horses and to look around.  She said that they found ten to twelve fairly new Keystone beer cans in a ditch on the side of the road.  She noted that Keystone beer was Russell’s favorite kind of beer and said that he drank it frequently.  

After hearing the above testimony, 
the jury found Russell guilty of violation of a protective order and assessed his punishment at 365 days’ confinement and a $2,000 fine.  
This appeal followed.

III.  Violation of Protective Order

A.  The Allegations Set Forth in the Information

The information alleged that Russell,

on or about [the] 26th day of February, A.D. 2005, and before the making and filing of this Complaint, in the County of Denton, of the State of Texas, did then and there in violation of an order issued under sections 6.504 or Chapter 85, Family Code, under Article 17.292, Code of Criminal Procedure, or by another jurisdiction as provided by Chapter 88, Family Code, intentionally or knowingly go to or within 250 feet of the residence of ERIN MCREA [sic] a protected individual under a Protective Order issued in cause number DF04-10408-V-303 in the 303rd Judicial District Court of Dallas County, Texas; 

against the peace and dignity of the State.

B. Russell’s Sufficiency Arguments

In his first point, Russell contends that there was insufficient evidence to establish that he violated a protective order as alleged in the information. Specifically, Appellant argues that the record is devoid of any evidence establishing that a protective order was issued under sections 6.504 or chapter 85 of the family code, under article 17.292 of the code of criminal procedure, or by another jurisdiction as provided by chapter 88 of the family code.  In his second and third points, Russell contends that there was legally and factually insufficient evidence to establish that he went within 250 feet of McRae’s residence.  In his fourth point, Russell argues that the evidence was legally insufficient to establish that he intentionally or knowingly went within 250 feet of McRae’s residence because there was no proof that Russell had knowledge of McRae’s residence.
(footnote: 3)  Because all of these points are interrelated and involve the same set of facts, we address them together below.

C. Legal and Factual Sufficiency Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact-finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact-finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact-finder’s.  
Zuniga, 
144 S.W.3d at 482.

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

D. Sufficiency Analysis

1. Protective Order Issued Under Family Code

With regard to whether the evidence established that the protective order was issued under any valid statute or pursuant to any divorce proceeding, McRae testified that the protective order was issued against Russell during their heated divorce.  Later during McRae’s testimony, the State admitted into evidence a certified copy of the protective order. 

Russell appears to contend that because the certified copy of the protective order was not admitted immediately following McRae’s testimony about obtaining the protective order and about her heated divorce from Russell, no evidence exists that the protective order was issued pursuant to any statutory provision as alleged in the information.  As set forth above, the information alleged that a protective order was issued under section 6.504 of the family code; that section states, “On the motion of a party to a suit for dissolution of a marriage, the court may render a protective order.”  
Tex. Fam. Code Ann.
 § 6.504 (Vernon 2006).  Russell points us to no case law or statute, and we know of none, requiring that the jury receive the certified copy of the protective order at the same time that it heard testimony from McRae regarding the protective order that was issued during her divorce from Russell.

Consequently, reviewing the record as a whole, we hold that there was sufficient evidence that the protective order in the present case was issued pursuant to section 6.504 of the family code, as alleged in the information.  
Cf. Gardner v. State
, No. 05-05-00750-CR, 2006 WL 1413098, at *2 (Tex. App.—Dallas May 24, 2006, no pet.) (mem. op.) (not designated for publication) (holding that record reflects that protective order was issued under chapter 85 of the family code).  We overrule Russell’s first point.

2. Sufficient Evidence of Distance

The State introduced a large aerial map of the property into evidence.  The aerial map contains a scale on the right hand side, demonstrating a 250-foot distance as portrayed on the map.  In front of the jury, McRae demonstrated on the aerial map the location where she was standing and the route that Russell had taken around and across the property.  From McRae’s testimony, from the locations pointed out by McRae on the aerial map, and by reviewing the aerial map introduced into evidence, the jury was able to determine that Russell was within 200 feet of the house where McRae was living.  Applying the proper standard of review, we hold that legally sufficient evidence exists to establish that Russell went within 250 feet of McRae’s residence on the date in question.  We overrule Russell’s second point.

Because there was no contrary evidence that Russell was in the area but outside the protected 250-foot zone, the issue for the jury was whether to believe McRae’s testimony that she saw Russell or whether to believe Russell’s testimony that he was at home on the day in question.  Because we are to give deference to the fact-finder’s determinations involving credibility of witnesses, we cannot say that the evidence was factually insufficient to prove that Russell came within the protected 250-foot zone.  
See Spencer-Auber v. State
, No. 05-03-01259-CR, 2004 WL 330096, at *2 (Tex. App.—Dallas Feb. 23, 2004, pet. dism’d) (not designated for publication) (holding that evidence was legally and factually sufficient to support conviction for violation of protective order even though State’s witnesses gave conflicting testimony and defense witnesses consistently stated that appellant never left his house on the evening in question).  We overrule Russell’s third point.

3. Sufficient Evidence Showing Knowledge of Residence

Russell claims that legally insufficient evidence exists to establish that he knew McRae resided at 105 East Brown Terrace and therefore that he  intentionally or knowingly went within 250 feet of that residence.  Although the protective order lists McRae’s residence as 2120 Pueblo Drive in Carrollton,  Russell admitted that he knew McRae was no longer living there because that house had been foreclosed on in late January.  McRae testified that Russell would have known that she had to move to a place where her three dogs could live and that he had visited her stepfather’s property in Shady Shores once while they were married.  In the early morning hours on the day in question, McRae’s half sister saw Russell in Carrollton, “hooting and hollering” while driving a white sport utility vehicle.  Later on the day in question, Heather said that she saw a white sport utility vehicle after she spotted Russell on the property.  At that time, both McRae’s vehicle and Heather’s vehicle were parked in the driveway and would have been recognized by Russell.  McRae’s half sister also testified that the next day, she and McRae found ten to twelve fairly new Keystone beer cans in a ditch on the side of the road near the property and that Russell’s favorite kind of beer was Keystone.  McRae testified that her stepfather’s house in Shady Shores is at the end of a dead-end road and that Russell had no reason to be in the area. 

Having considered all of the evidence in the light most favorable to the judgment, we conclude that a rational trier of fact could have found that Russell had determined that McRae was living at the Shady Shores property and that he intentionally or knowingly went there in violation of the protective order.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789
; 
Lee v. State
, 983 S.W.2d 77, 78 (Tex. App.—San Antonio 1998, no pet.) (holding that legally sufficient evidence existed showing that appellant knew of the protective order and knowingly violated it when he went to complainant’s mother’s apartment—in the same apartment complex where complainant lived—because protective order listed address of apartment complex
 as complainant’s address); 
see also Cowley v. State
, No. 11-99-00220-CR, 2000 WL 34235120, at *3 (Tex. App.—Eastland Aug. 31, 2000, no pet.) (not designated for publication) (holding that 
legally sufficient evidence existed showing that appellant 
intentionally and knowingly violated protective order by going within 500 feet of complainant’s house).  We overrule Russell’s fourth point.

IV.  Failure to Preserve Error Regarding Inadmissible Portions of the 911 Tape That Were Played for the Jury

In his fifth point, Russell argues that the trial court committed reversible error by failing to grant a mistrial because an inadmissible portion of the 911 tape was played for the jury.
(footnote: 4)  The State responds that Russell did not preserve his claim because he failed to request an instruction to disregard. 

During the trial, the State introduced a recording of the 911 call made by McRae.  Russell objected to two portions of the recording in which McRae told the operator that Russell “had just gotten out of jail” and that “he’s crazy.”  The trial court sustained Russell’s objections to those two portions of the recording.  The State agreed to reduce the volume a couple of seconds before each statement played on the recording, and the trial court admitted the recording with the understanding that the jury would not hear the two objected-to statements.  

However, Russell claims that when the recording of the 911 call was played for the jury, the State tried to mute the volume, but the microphone was still slanted downward and the two objected-to statements were audible and the jury heard them.
(footnote: 5)  Russell asked for a mistrial, specifically stating that he was not requesting the trial court to give the jury any instruction to disregard because it would call more attention to the inadmissible statements.  The trial court denied Russell’s motion for mistrial but told the State that it would “not be able to argue that issue and [would] not be able to cross-examine or bring that issue up. . . . ” 

Generally, a defendant who requests a mistrial without first requesting a curative instruction forfeits appellate review of that class of events that could have been cured.  
Young v. State
, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). An exception to this general rule may occur when any instruction to disregard could not have cured the harm caused.  
Id.
; 
see also Barnett v. State
, 189 S.W.3d 272, 278 (Tex. Crim. App. 2006).  In a case directly on point, we have held that isolated, unmuted videotape comments concerning a defendant’s criminal history constitute the type of error that may be cured by an instruction to disregard.  
Hayes v. State
, No. 02-03-00515-CR, 2005 WL 1994178, at *1-2 (Tex. App.—Fort Worth Aug. 18, 2005, pet. ref’d) (mem. op.) (not designated for publication).  In 
Hayes, 
we held 
that the trial court did not abuse its discretion by denying appellant’s motion for mistrial when the State failed to depress the mute button during inadmissible portions of a videotape referencing appellant’s prior arrest.  
Id
.  In that case, the appellant moved for and received an instruction to disregard.  
Id.
 at *1.  We concluded that the fact of appellant’s prior arrest “was not embellished, relied on, argued, or treated in any manner so inflammatorily as to undermine the efficacy of the trial court’s instruction to disregard.”  
Id.
 at *2.

In the case at hand, Russell decided not to request an instruction to disregard.  While such a decision may certainly be sound trial strategy, the lack of a request for an instruction to disregard forfeits appellate review of any alleged error resulting from isolated comments concerning a defendant’s criminal history, and here, his mental state.  
See Young 
137 S.W.3d at 70; 
Hayes
, 2005 WL 1994178, at *1-2; 
see also Ovalle v. State
, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (stating that “[o]rdinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses”).  As we held in 
Hayes
, this type of error falls into the class of events that could have been cured by an instruction to disregard.  
Hayes
, 2005 WL 1994178, at *1-2.  Consequently, Russell has forfeited appellate review of any error that occurred when the volume on the 911 tape was not completely muted during the two objected-to statements.  We therefore overrule Russell’s fifth point.

V.  Conclusion

Having overruled all five of Russell’s points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL F:  LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: October 12, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The State played portions of the tape from McRae’s phone call to 911 for the jury. 

3:
Russell does not argue that he did not have knowledge of the protective order.

4:
Russell does not argue that the State intentionally failed to mute the recording.

5:
For purposes of our analysis, we will assume that the statements were audible to the jury.  The record, however, is not clear on this point.  Russell’s counsel claimed that she could hear the statements despite the lack of volume, but the record does not affirmatively reflect that any juror heard the statements.